IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **DANIEL F. ERKER,** | ) | **CASE NO. 8:08CV237** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **AMERICAN COMMUNITY MUTUAL INSURANCE CO.,** | ) ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant American Community Mutual Insurance Company's Motion for Summary Judgment (Filing No. 25). For the reasons set forth below, American Community's motion will be denied.

## UNDISPUTED FACTS

American Community Mutual Insurance Company ("American Community") is an insurance sales company authorized to do business in the State of Nebraska. (Filing No. 1, ¶ 4; Filing No. 6, ¶ 4.) In 2006, People's Services Center, Inc. ("Peoples") contracted with American Community to provide and administer a group health insurance policy ("policy") for its employees. The policy defines "Pre-existing Condition" as "an illness for which medical advice, diagnosis, care, or Treatment was recommended or received within the 6 month period prior to the Insured Individual's Enrollment Date." (Filing No. 27-4, at 27.) The policy also defines "Treatment" as "medical or surgical management of an illness, including seeking medical advice, consultation, testing, surgery, or therapy, or the use of Prescription Drugs." (*Id.*, at 21.) The policy has separate coverage for medical and dental benefits. (*Id.*, at 13, 17.) The Dental Benefit section of the policy defines a "Covered Dental Charge" as services provided by a dentist. (Filing No. 27-5, at 27.) A "Dentist" as

defined by the policy is a "Doctor licensed as such by the state where Dental treatment is rendered." (*Id*.)  The specific Dental Benefits of the policy do not exclude pre-existing conditions.  (*Id*., at 30-32.)

Peoples hired Erker on June 19, 2006, and enrolled him in the group policy on the same day.  (Filing No. 1, ¶¶ 9, 10; Filing No. 6, ¶¶ 9, 10.)  Erker became eligible for benefits on August 1, 2006.  The policy excluded coverage of Erker's preexisting conditions for 10 months afer his effective date of coverage.  (Filing No. 27-3, at 3.)

Dr. Joseph L. Skradski, DDS, had treated Erker since approximately 1999.  (Filing No. 29-2, at 4:19-20.)  Dr. Skradski described his care for Erker as "[r]outine dental prophylaxis or cleaning, routine dental care, including restoration of teeth, and some associated evaluation of [temporomandibular joint] TMJ or joint problem involving [Erker's] mandible." (*Id.* at 3:25-4:4; 4:24-5:2.)  On May 16, 2006, Dr. Skradski examined Erker and took X-rays as part of his regular treatment.[1]  (*Id*., at 5:14-15.)  Dr. Skradski discovered a one-centimeter mass in Erker's left TMJ area.  (*Id.*, at 21.)  Dr. Skradski palpated the joint, noticed swelling, advised Erker of the mass and told him to "keep an eye on it" and return in a month.  (*Id*., at 6:23-7:18; 16.)

Erker returned to Dr. Skradski's office on June 27, 2006, for a check of the mass.  (*Id*., at 7:19-8:1.)  Dr. Skradski then referred Erker to an oral surgeon, Dr. John D. Engel, D.D.S., M.D., to examine the mass in Erker's left parotid area.  (*Id*., at 10:7-20; Filing No. 29-4, at 8.) On October 9, 2006, Dr. Engel received CT scan results that showed a mass associated with the anterior portion of the parotid gland.  Dr. Engel then referred Erker for

---

[1] Dr. Skradski's curriculum vitae describes his expertise as a "[p]racticing doctor of dental surgery licensed in the state of Nebraska."  (Filing No. 29-5, at 6.)

further treatment. (Filing No. 29-4, at 8.) On October 13, 2006, Dr. Alan T. Richards of the Methodist Estabrook Cancer Center examined Erker and recommended that he have the mass, then diagnosed as a tumor, removed. (Filing 29-3, at 15-16.) On November 7, 2006, Dr. Richards surgically removed the three-centimeter tumor in Erker's parotid gland. (*Id*., at 17-18.)

Following the surgery, Erker submitted his bills for the surgery to American Community. (Filing No. 28-5, at 3.) American Community advised Erker in a letter dated February 27, 2007, that it had reviewed Erker's medical records and determined that the parotid mass that Dr. Richards removed was a pre-existing condition as defined in the policy. Therefore, American Community denied Erker's claim. (*Id*., at 5.) On July 31, 2007, Erker's attorney, Matthew A. Lathrop, wrote to American Community stating Erker's intent to appeal the denial of his claim. (*Id*., at 13.) On September 11, 2007, in support of Erker's appeal, Mr. Lathrop submitted documents, including Dr. Skradski's sworn statement,[2] to American Community. (*Id*., at 17.) Also on September 11, 2007, Mr. Lathrop submitted a letter arguing that Erker's condition did not meet the definition of a pre-existing condition under the policy because Erker did not "'receive advice, diagnosis, care, or treatment within the six month period prior to enrollment.'" (*Id*., at 18.) Mr. Lathrop's letter reasoned that, as a dentist, Dr. Skradski did not meet the policy definition of "'Doctor'" and thus could not give medical advice, diagnosis, care, or treatment. (*Id.,* at 17-18.)

On September 19, 2007, American Community notified Erker's attorney that it would begin a "grievance review process" regarding American Community's denial of Erker's

---

[2]Dr. Skradski's sworn statement is at Filing No. 29-2.

claims under the pre-existing condition exclusion in the policy.  (Filing No. 28-5 , at 21.)  After review, American Community upheld its prior determination that the parotid mass was a pre-existing condition under the policy because it was initially diagnosed and further treatment was recommended during the six-month period before Erker's enrollment date. (*Id.*, at 22-23.)

Erker brought this action against Peoples and American Community on June 5, 2008.  On Erker's motion, the Court dismissed Peoples without prejudice on April 10, 2009. Erker claims that American Community wrongfully denied a claim for health benefits based on the term "preexisting condition" in the American Community insurance policy.  American Community now moves for summary judgment.

## STANDARD OF REVIEW

Summary judgment is only proper when the Court, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor, determines the evidence "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact."  *Id.*  Instead, "the burden on the moving party may be discharged

by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "a genuine issue of material fact such that [his] claim should proceed to trial." *Nitro Distrib., Inc. v. Alitcor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The nonmoving party is required to demonstrate a "genuine issue of material fact" that is outcome determinative–"a dispute that might 'affect the outcome of the suit under the governing law . . . .'" *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985)). Thus, a "genuine issue" is more than "some metaphysical doubt as to the material facts," *Nitro Distrib. Inc.*, 565 F.3d at 422 (quoting *Matsushita*, 475 U.S. at 586-87), and "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Bloom*, 440 F.3d at 1029-30 (emphasis and quotation marks removed) (quoting *Anderson*, 477 U.S. 247-48).

In other words, "[o]n a motion for summary judgment, [the] facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "genuine issue for trial"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587.

## DISCUSSION

I.   **ERISA Standard of Review for a Denial of Benefits**

Erker seeks review of American Community's denial of his claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) (2009). The first step under a § 1132(a)(1)(B) claim is to identify the level of deference which the Court must give the insurance company's prior decision. The Supreme Court has declared that a court should conduct a *de novo* review to a denial-of-benefits challenge, unless the benefit plan grants to the plan administrator or to the fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). When a plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits, then the decisions are reviewed for abuse of discretion. *Id.* If the plan itself does not give the administrator discretionary authority to construe uncertain terms, courts review the claim by looking to the terms of the plan and manifestations of the parties' intent. *Id.* at 112-13. In the Eighth Circuit, the abuse-of-discretion standard applies only where the policy in question contains "explicit discretion-granting language." *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 839 (8th Cir. 2008) (quoting *Bounds v. Bell Atlantic Enter. F.L.T.D. Plan*, 32 F.3d 337, 339 (8th Cir.1994)).

In *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000), a case cited favorably by the Eighth Circuit in *Walke*, the Seventh Circuit stated "the mere fact that a plan requires an administrator, or requires proof or satisfactory proof of the applicant's claim, or requires both a determination and proof (or satisfactory proof), does not give the

6

employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary." An administrator would not meet its fiduciary obligation to other participants in a plan by paying benefits without first determining whether the claimant was entitled to them. *Id.* "The claim provisions of a typical insurance policy 'do not trigger the deferential ERISA standard of review.'" *Walke*, 256 F.3d at 839 (quoting *Ravenscraft v. Hy-Vee Benefit Plan & Trust*, 85 F.3d 398, 402 n.2 (8th Cir. 1996)). Conferring discretion on an ERISA plan administrator affects the rights of plan participants and beneficiaries, and affects the burden on the administrator to explain its decision. *Id.* at 840. Because it is easy for insurers and administrators to use unambiguous language conferring discretion, a presumption against intent to create discretion arises if a policy contains ambiguous claims language common to non-ERISA insurance contexts. *Id.*

Here, it is undisputed that American Community is the administrator of the policy. American Community claims the standard of review for the purposes of this motion should be abuse-of-discretion because the policy grants American Community discretionary authority to make decisions regarding any grievance submitted under the policy. (Filing No. 26, at 2.) In support of this argument, American Community cites to an affidavit of Dawn Ruchala, a Post Resolution Analyst for American Community, prepared for this litigation. (Filing No. 27-2, ¶¶ 1-4.) In her affidavit, Ruchala claims that American Community had discretionary authority to make decisions regarding grievances under the policy. (*Id.*, ¶ 5.) In support of this assertion, Ruchala's affidavit cites generally to the Formal Grievance Procedures ("Grievance Procedures") of the policy. (*Id.*, ¶ 5; Filing No.

27-3, at 21-28.)  This broad assertion is insufficient to confer discretion upon American Community.  American Community does not cite a specific provision in the Grievance Procedures that contains "explicit discretion-granting language" required to trigger the abuse-of-discretion standard.  Further, a careful review of the Grievance Procedures reveals no such language.  The only provision that may be relevant is the definition of "Adverse Determination" in the Definitions section of the Grievance Procedures, which states:

> Adverse determination means a determination by [American Community] or its designee. . . that [a] . . . health care service has been reviewed and, based on the information provided, does not meet [American Community's] requirements for medical necessity, appropriateness, health care setting, level of care, or effectiveness, and insurance coverage for the requested health care service is therefore denied, reduced, or terminated.

(*Id*., at 26.)

The phrases "a determination by [American Community] or its designee" and "does not meet [American Community's] requirements" do not adequately confer discretion on American Community.  Any claim under an insurance policy must meet certain requirements imposed by the company before it will be paid.  An adverse determination based on a failure to meet American Community's requirements does not infer that American Community has express discretion to determine when the requirements have been met.  While American Community or its designee determine whether a claimant meets American Community's requirements, the Grievance Procedures do not delineate even an arbitrary level to which a claimant must satisfy those requirements.[3]  Nor do the

---

[3] *See Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002) (finding discretionary language where the policy stated "[t]he employee must provide written proof of continued total disability at reasonable intervals by [the decisionmaker]

Grievance Procedures expressly grant American Community discretionary power to interpret the policy.[4]  The language of the Grievance Procedures does not give notice to policy holders that American Community will make an adverse determination based on American Community's discretionary determination.  Because the Grievance Procedures lack unambiguous language conferring discretion, the Court presumes a lack of intent to grant discretion.  American Community does not cite any other provision that expressly grants discretion to interpret the policy or make determinations.  Therefore, the Court will review the denial of benefits *de novo*.

## II.     Application of De Novo Review to Erker's Claim

The Court examines a benefits claim subject to *de novo* review without deference to any party's interpretation.  *See Bruch*, 489 U.S. at 112-13 ("If the plan does not give the employer or administrator discretionary or final authority to construe uncertain terms, the court reviewed the employee's claim as it would have any other contract claim - by looking to the terms of the plan and other manifestations of the parties' intent").  Under *de novo* review, a federal court may apply federal common law under ERISA to interpret terms in a plan which are in dispute.  *King v. Hartford Life and Accident Ins. Co.*, 414 F.3d 994, 998

---

and that such proof must be satisfactory to [the decisionmaker.]").

[4] *See Kennedy v. Georgia Pacific Corp.*, 31 F.3d 606, 609 (8th Cir. 1994) (granting discretion where plan stated the decisionmaker "shall be solely responsible for the administration and interpretation" of the plan); *see also Donaho v. FMC Corp.*, 74 F.3d 894, 898 (8th Cir. 1996) *abrogated on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003) (decisionmaker had power to "construe and interpret" the plan); *Dirdsell v. United Parcel Serv. of Am., Inc.*, 94 F.3d 1130, 1133 n.2 (8th Cir. 1996) (using an abuse of discretion review where the plan gave the decisionmaker "exclusive right and discretion to interpret the terms and conditions of the plan, and to decide all matter arising in its administration and operation . . . .").

(8th Cir. 2005). Further, when reviewing an ERISA plan de novo, the Court examines the language contained in the plan documents. *See Bond v. Cerner Corp.*, 309 F3d 1064, 1067 (8th Cir. 2002). In so doing, the Court must "interpret the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" *Adams v. Continental Cas. Co.*, 364 F.3d 952, 954 (8th Cir.2004) (quoting *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 789-90 (8th Cir.2002)). Each provision much be examined consistent with other statements in the plan as an integrated whole. *Bond v. Cerner*, 309 F.3d 1064, 1067-68 (8th Cir. 2002).

Under general principles of contract law, "the meaning of an unambiguous contract presents a question of law appropriate for summary judgment." *McCormack v. Citibank*, N.A., 100 F.3d 532, 538 (8th Cir. 1996). However, "the interpretation of an ambiguous contract presents a question of fact, thereby precluding summary judgment." *Id.* (quoting *Michalski v. Bank of Am. Ariz.*, 66 F.3d 993, 996 (8th Cir. 1995)). Whether an ERISA plan is ambiguous is a matter of law resolved by the contract. *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007). "Ambiguity exists where a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term." *Id.* (quoting *Admin. Comm. of the Wal-Mart Assocs. Health and Welfare Plan*, 393 F.3d 1119, 1123 (10th Cir. 2004)). To determine whether the language of a plan is ambiguous, the Court considers the "common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Id.*

Summary judgment depends on whether any advice, diagnosis, care or treatment provided by Dr. Skradski on May 16, 2006, clearly ran afoul of the pre-existing condition provision under the policy. The policy defines a pre-existing condition as "an Illness for which *medical* advice, diagnosis, care, or Treatment was recommended or received within the 6 month period prior to the Insured Individual's Enrollment Date." (Filing No. 27-3, at 7, emphasis added.) Erker argues that the mass found by Dr. Skradski during the May 16, 2006, visit could not have been *medical* advice, diagnosis, care, or treatment because, as a dentist, Dr. Skradski is not a medical doctor and is therefore unauthorized to render medical services. Erker also argues that even if Dr. Skradski could provide medical advice, diagnosis, treatment, or care, he did not do so for Erker on May 16, 2006. American Community argues Dr. Skradski provided advice, treatment, and care on May 16, 2006, and his services fit within the policy's pre-existing condition provision. In interpreting the policy, Erker's main argument centers on the term "medical" as it modifies advice, diagnosis, treatment, or care. Erker would have the Court read the term narrowly to include only services provided by those authorized to practice medicine, while American Community argues that the term "medical" embraces the broader scope of all health care services, including dentistry.

As American Community recognizes in its brief, the term "medical" is not defined in the policy. Because "medical" may reasonably be read to modify advice, diagnosis, treatment, and care, its meaning is vital in determining whether Dr. Skradski's services triggered the policy's pre-existing condition exclusion. American Community does not cite, and the Court is not aware, of any authority stating that a dentist's services are always

11

medical services.[5] Even though the policy's broad definitions of "Medical Benefits" and "Health Care Providers" may be read to include dentists, no provision expressly and unambiguously encompasses dental services within "medical" services. A reasonable person in Erker's position could interpret the pre-existing condition provision to exclude only medical services and not dental services. Further, a material issue of fact remains as to whether the services Dr. Skradski rendered were "medical" under the policy. Because the term "medical" is reasonably susceptible to more than one meaning thus creating uncertainty, the Court finds the term is ambiguous as used in the pre-existing condition exclusion. Therefore, material issues of fact remain and summary judgment is not proper.

Accordingly,

IT IS ORDERED that Defendant American Community Mutual Insurance Company's Motion for Summary Judgment (Filing No. 25) is denied.

DATED this 1st day of October, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

---

[5] In support of its argument that Dr. Skradski's services were clearly medical, American Community cites to a dictionary definition that defines "medical" as "connected with medicine or the practice or study of medicine." American Community then cites cases which applied a broad definition of "medicine" to include more than the practice of medical doctors. While the broad definition may encompass dentistry, the Nebraska Supreme Court has recognized a difference between the practice of medicine and the practice of dentistry. See Miller v. Horton, 574 N.W.2d 112, 116 (Neb. 1998) (reviewing an administrative decision regarding whether a dentist strayed beyond the scope of dentistry and into the practice of medicine).